IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NO. 1:19-CR-227 |
| | : |
| v. | : (Chief Judge Conner) |
| | : |
| **TRAVIS PARKER,** | : |
| | : |
| **Defendant** | : |

## MEMORANDUM

*Pro se* defendant Travis Parker moves the court to suppress evidence obtained following a warrantless arrest and warrantless searches incident to that arrest. (Doc. 38). We will deny Parker's motion because the arrest and searches were lawful.

## I. Findings of Fact[1]

On September 4, 2018, York City Police Officer Clayton Glatfelter[2] contacted a confidential source ("CS"), who purportedly could purchase "crack cocaine" from a black male at a particular phone number. (3/12/20 Tr. 6:8-16). According to Officer Glatfelter, he recognized the number provided by the CS to be associated with Parker due to previous drug investigations. (Id. at 6:16-7:1).

---

[1] The following factual narrative derives from testimonial evidence adduced during the suppression hearing in this matter, together with exhibits submitted by Parker. Citations to hearing exhibits are abbreviated as "Def. Ex." Citations to the March 12, 2020 suppression hearing transcript are abbreviated as "3/12/20 Tr. __."

[2] Although the suppression hearing transcript spells Officer Glatfelter's last name as "Gladfelter," we note that multiple records indicate that the correct spelling is "Glatfelter." (See, e.g., Def. Exs. 3, 4).

Armed with this information, Officer Glatfelter decided to target Parker in a "buy/walk" operation, where a controlled drug sale would occur but no arrest would be made. (Id. at 11:25-12:6, 34:12-22). Officer Glatfelter directed the CS to call Parker at the identified number and order $60 worth of "rock," or crack cocaine, to be delivered at a set location in the 100 block of East College Avenue in York, Pennsylvania. (Id. at 7:12-8:7). Officer Glatfelter then organized a surveillance team to witness the intended transaction. (Id. at 7:6-9).

After searching the CS and finding no contraband, weapons, or currency, Officer Glatfelter provided specified buy-money and directed the CS to wait for the seller at the prearranged meeting place. (Id. at 7:9-11, 8:16-19, 15:10-21). Surveillance team members then reported seeing Parker exit a residential building on the 100 block of East College Avenue and walk to the location where the CS was waiting. (Id. at 8:14-25). From his vantage point, Officer Glatfelter was able to observe the CS during the alleged transaction but could not see the target because that individual was positioned in a narrow breezeway between two buildings, shielding him from Officer Glatfelter's view. (Id. at 9:6-23, 10:12-25). According to officers on the scene, no person other than Parker and the CS was seen entering or exiting the breezeway or general meeting area. (Id. at 10:1-11, 11:8-12, 29:16-21). Following the alleged hand-to-hand sale, the CS turned over a quantity of cocaine

to Officer Glatfelter that was purportedly purchased during the brief interaction.[3] (Id. at 11:15-19). No arrest was made that day. (Id. at 11:25-12:6).

Parker was again targeted on January 30, 2019. During this operation, York City Police Officer Vincent Monte utilized the same confidential informant to set up another drug transaction with Parker. (Id. at 38:2-19). Officer Monte was familiar with Parker from prior investigations and had also been present for the September 4 "buy/walk" operation. (Id. at 38:5-12). This time, Officer Monte planned a simple "bust" where Parker would be taken into custody if he arrived to complete a scheduled drug deal with the CS. (Id. at 39:1-23).

Like the previous operation, the CS called a number linked to Parker and ordered a "quantity of cocaine." (Id. at 40:2-6). The male voice on the other end of the line indicated that he would be at the designated meeting place shortly. (Id. at 40:7-8). Officer Monte alerted the other officers staged in the area that they were to take Parker into custody immediately if he appeared at the deal location. (Id. at 40:8-11). When Parker arrived on foot in the 100 block of East College Avenue, officers reported his arrival via radio and Officer Monte ordered them to arrest him. (Id. at 41:5-14, 51:8-13).

Once in custody, Parker was immediately searched by the arresting officers. (Id. at 42:4-10, 76:8-19). They found approximately $1,100 in cash and a cell phone

---

[3] Although Officer Glatfelter repeatedly testified that the substance ordered, purchased, and turned over to him by the CS on September 4 was cocaine base or "crack" cocaine, (see 3/12/20 Tr. 6:14-15, 7:15-16, 11:16-17, 12:13-16, 17:23-25, 19:10, 22:24-25), laboratory testing determined that the substance was cocaine hydrochloride or "powder" cocaine, (see Def. Ex. 3).

but no weapons or drugs. (Id. at 42:4-10, 43:10-20, 76:8-19; Def. Ex. 5). Officer Monte directed the arresting officers to transport Parker to the York County Drug Task Force office, where Officer Monte planned to perform a more thorough search. (3/12/20 Tr. 42:11-20). According to Officer Monte, the CS had explained that Parker frequently concealed drugs in his underwear or anal cavity, information that had been corroborated by a second confidential informant and was a common tactic used by drug dealers to hide contraband. (Id. at 42:15-43:6, 44:6-14, 68:2-4).

Officers transported Parker to the task force office and placed him in a private, locked room. (Id. at 77:3-17, 78:9-23). Per Officer Monte's instruction, two male officers visually strip-searched Parker. (Id. at 77:13-78:23). During the strip search, officers saw a portion of a plastic bag containing a white substance protruding from Parker's anal cavity, which they removed using gloves. (Id. at 78:3-6, 79:3-13). The bag contained several illegal substances including crack cocaine, powder cocaine, and prescription pills. (Id. at 81:7-12; Def. Ex. 9 at 5-6). Parker's January 30 arrest, search incident to arrest on the scene, and strip search at the task force office were all conducted without a warrant.

## II. Procedural History

In July 2019, a federal grand jury returned a three-count indictment charging Parker with distribution of cocaine hydrochloride on September 4, 2018, in violation of 21 U.S.C. § 841(a)(1) (Count 1); possession with intent to distribute 28 grams and more of cocaine base on January 30, 2019, after prior conviction for a serious drug felony in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) (Count 2); and possession with intent to distribute cocaine hydrochloride on January 30, 2019, in violation of

21 U.S.C. § 841(a)(1) (Count 3). Parker pled not guilty and was appointed counsel from the Federal Public Defender's Office. Parker requested to proceed *pro se* and, following a hearing, was permitted to represent himself. He then moved to suppress all evidence stemming from the January 30, 2019 arrest and searches. The court convened a suppression hearing on March 12, 2020, and the parties filed briefing shortly thereafter. Parker's motion is now ripe for disposition.

### III. Discussion

Parker contends that the January 30, 2019 warrantless arrest violated his Fourth Amendment rights. He posits that this allegedly unlawful arrest led to unlawful warrantless searches incident to that arrest, requiring suppression of evidence obtained. We disagree.

#### A. Warrantless Arrest and Conventional Search Incident to Arrest

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). To be reasonable, a warrantless arrest in a public place by a police officer must be supported by probable cause that the suspect has committed, or is committing, criminal activity. District of Columbia v. Wesby, 583 U.S. __, 138 S. Ct. 577, 586 (2018). When probable cause to arrest is challenged, a court must determine whether the historical facts and circumstances within the arresting officer's knowledge are sufficient to warrant an objectively reasonable police officer to believe that the suspect has committed or is committing an offense. Id.; Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citation omitted). Probable cause for arrest "requires only a

5

probability or substantial chance of criminal activity, not an actual showing of such activity." Wesby, 138 S. Ct. at 586 (citation omitted).

Probable cause is an amorphous concept. Ornelas v. United States, 517 U.S. 690, 695-96 (1996). It is "not readily, or even usefully, reduced to a neat set of legal rules." Id. (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Its existence must be determined from the view of the officer on the street, not the judge in the courtroom. United States v. Sokolow, 490 U.S. 1, 7-8 (1989); see also United States v. Cortez, 449 U.S. 411, 418 (1981). Whether probable cause exists is an *objective* determination based on the totality of the circumstances present at the time of the challenged governmental conduct. See United States v. Williams, 413 F.3d 347, 353 n.6 (3d Cir. 2005). Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014).

We have little difficulty finding that Parker's January 30 warrantless arrest was supported by probable cause. Parker was being investigated for drug trafficking by York City police and, as part of that ongoing investigation, allegedly completed a controlled buy on September 4, 2018. Multiple officers witnessed the September 4 events and one took pictures of Parker at the scene. (See Def. Exs. 7, 8). Officer Monte, who ordered Parker's arrest on January 30, was present during the September 4 operation. Using the same confidential informant, Officer Monte set up a similar drug transaction for January 30 at the same general location. The CS contacted Parker at the same cell phone number, ordered a quantity of cocaine, and agreed to meet Parker for the exchange in a short amount of time. Parker appeared at the location, and within the time frame, expected by Officer Monte,

6

suggesting that Parker was indeed the male individual on the phone who had agreed to sell cocaine.

These facts, taken together, are more than sufficient for an objectively reasonable police officer to believe that Parker was in the process of committing a felony drug offense under Pennsylvania law: possession with intent to distribute cocaine, 35 PA. STAT. AND CONS. STAT. § 780-113(a)(30).[4]  Thus, Parker's January 30 warrantless arrest was lawful.  And because Parker's arrest was lawful, the routine warrantless search incident to arrest conducted by officers on the scene was reasonable as a matter of law.  See United States v. Robinson, 414 U.S. 218, 235 (1973).

### B.   Warrantless Strip Search

The warrantless strip search demands closer scrutiny.  "The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.  Not every search 'is acceptable solely because a person is in custody.'"  Riley v. California, 573 U.S. 373, 392 (2014) (quoting Maryland v. King, 569 U.S. 435, 463 (2013)).  Certainly, the Fourth Amendment does not permit warrantless strip searches incident to arrest for every infraction.  See, e.g., Evans v. Stephens, 407 F.3d 1272, 1279 (11th Cir. 2005) (*en banc*) (holding unconstitutional post-arrest investigatory strip searches lacking even reasonable suspicion of concealed evidence); Roberts v. Rhode Island, 239 F.3d 107,

---

[4] (See Def. Ex. 4 (February 5, 2019 arrest warrant issued for January 30 events citing Section 780-113(a)(30) as "lead offense")).

7

113 (1st Cir. 2001) (finding institutional strip-search policy that covered all arrestees, even those in custody for minor offenses, unconstitutional); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1268-73 (7th Cir. 1983) (holding suspicionless jailhouse strip searches of misdemeanants unreasonable under Fourth Amendment).[5]

Neither the Supreme Court nor the Third Circuit Court of Appeals has directly addressed—outside the institutional setting—the constitutionality of strip searches incident to arrest. Nevertheless, the prevailing consensus from courts that have considered the issue is that these intrusive searches must be supported by, at minimum, reasonable suspicion of concealment of weapons or contraband. See Jiminez v. Wood County, 660 F.3d 841, 847 (5th Cir. 2011) (*en banc*); Hartline v. Gallo, 546 F.3d 95, 100-01 (2d Cir. 2008); Evans, 407 F.3d at 1279; United States v. Clemons, No. 08-28, 2010 WL 597992, at *4 (W.D. Pa. Feb. 17, 2010), aff'd on other grounds, 499 F. App'x 207 (3d Cir. 2012) (nonprecedential); cf. Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir. 2000). Reasonable suspicion could arise from the offense of arrest itself or from the particularized facts and circumstances known to the arresting officer. See Way v. County of Ventura, 445 F.3d 1157, 1161 (9th Cir. 2006); Weber v. Dell, 804 F.2d 796, 804 (2d Cir. 1986); Mary Beth G., 723 F.2d at 1271 n.7 (citing Salinas v. Breier, 695 F.2d 1073 (7th Cir. 1982)).

---

[5] In this regard, we find the government's reliance on United States v. LePree, 434 F.2d 1034 (3d Cir. 1970) (*per curiam*), misplaced. We do not read LePree as permitting a strip search incident to any lawful arrest. In that case, the arresting officers had specific, reliable information that the defendant was committing a felony counterfeiting offense and had hidden counterfeit currency in his pants, thus warranting a strip search. See LePree, 434 F.2d at 1035, 1036.

Parker's strip search was reasonable under any metric applied in the foregoing cases.  His offense of arrest was possession with intent to distribute cocaine, a felony drug-trafficking offense rather than an unrelated misdemeanor.  Like the September 4 controlled buy, Parker arrived to meet the CS shortly after the CS ordered a quantity of cocaine using a cell phone number linked to Parker.  Not one but *two* confidential informants told Officer Monte that Parker often secrets contraband in his underwear or anal cavity.  And when Parker arrived at the prearranged location and was arrested, he was found to be in possession of a large amount of cash but no drugs (even though he was allegedly responding to a request for cocaine).

These specific and articulable facts, along with Officer Monte's knowledge and experience related to drug enforcement, raise at least reasonable suspicion, if not probable cause, that Parker had concealed drugs on his person.  Hence, a visual strip search was constitutionally permissible.  Moreover, the strip search was carried out in a reasonable manner by two male police officers in a private, locked room at the task force office.  There was no Fourth Amendment violation and therefore suppression of evidence seized on January 30 is unwarranted.

**IV.     Conclusion**

We will deny Parker's motion (Doc. 38) to suppress evidence because he has failed to identify a Fourth Amendment violation.  An appropriate order shall issue.

> /S/ CHRISTOPHER C. CONNER
> Christopher C. Conner, Chief Judge
> United States District Court
> Middle District of Pennsylvania

Dated:     May 1, 2020